THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN LEE *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 84—2453, 84—2454 cons.

Opinion filed October 13, 1987.

John M. Cutrone, of Chicago, for appellant Norman Lee.

Michael B. Nash and Thomas R. Nash, both of Nash & Nash, of Chicago, for appellant Edwin Phillips.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Alison J. Willis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

After a bench trial, Edwin Phillips (Phillips) and Norman Lee (Lee) were found guilty of delivery and possession of over 30 grams of cocaine, a Class X felony, and were sentenced to 10 years' incarcer-

ation. On appeal, both defendants contend that reversible error was committed when the trial judge audited certain tape-recorded conversations in the presence of only the prosecuting attorney. Lee also argues that: (1) it was not proved beyond a reasonable doubt that he was involved in the drug transaction; (2) there was insufficient proof that he delivered in excess of 30 grams of cocaine; and (3) the trial court erred in overruling objections to allegedly hearsay evidence. We affirm.

Pursuant to an investigation of Chicago police officers who were suspected of being involved in drug trafficking, in April 1982 the Internal Affairs Division (IAD) of the Chicago police department executed a valid search warrant at the residence of Gregory Grant (Grant), a former police officer who had a long history of drug use as well as a record of disciplinary problems when he was a member of the police force. The search uncovered drugs, drug paraphernalia, and $15,000 cash, and, as a result thereof, Grant was charged with various drug-related offenses.

Grant subsequently entered into a plea bargaining agreement with the Cook County State's Attorney, the terms of which required him to cooperate with the IAD in its ongoing narcotics investigation. Accordingly, Grant agreed to record secretly any future conversations between himself and Phillips, a suspected drug user. Grant testified that he thereafter recorded two of his telephone conversations with Phillips on May 5, 1982, another on May 6, and five on May 10. During these conversations, a voice, which Grant identified as Phillips', related to Grant that he was selling half ounces of cocaine for $1,050. In the course of several of these discussions, Phillips and Grant referred to a man named "Norman" in connection with the purchase of drugs. Phillips and Grant ultimately agreed that May 10, 1982, would be a suitable day for Grant to go to Phillips' apartment to purchase cocaine.

Before he went to Phillips' apartment on May 10, Grant rendezvoused with a police drug-enforcement team in the parking lot of the Museum of Science & Industry in Chicago. Lieutenant Richard Sandberg of the IAD testified that at this time he placed a "Nagra" tape recorder and transmitter on Grant's person. Sergeant Chandler, also of the IAD, related that he thoroughly searched Grant's person and car, after which Grant was furnished with $3,400 in currency by Agent Wayne Kowalski of the Federal Drug Enforcement Administration. Sandberg, Chandler, Kowalski, and Officer Victor Howard of the IAD proceeded to follow Grant to Phillips' residence near 68th Street and Crandon in Chicago, where they parked and maintained surveil-

lance of the building in which Phillips' apartment was located. Before entering the building, Grant activated the sound recording system.

The recording thus made indicated that in addition to Grant, two other men were at Phillips' apartment that evening. At trial, Grant identified the voices of the other two men as belonging to the defendants. Although Lee was never mentioned in the tapes by his last name, Phillips and Grant were recorded as conversing with a third person named "Norman." According to Grant's account, after initial greetings, the three men stepped into the den and seated themselves at a table upon which Grant observed a triple beam scale containing a white powdery substance. He also related that he counted out $3,300 in the presence of Lee. The tape recording indicates that at this time Phillips told Grant that he had only one ounce of cocaine, and not the ounce and a half Grant had requested in their prior phone conversations. The voice Grant identified as Lee's stated, "That ain't no problem." Lee then left the apartment for approximately a half hour and returned with a clear plastic bag containing more white powder, which Grant assumed was more cocaine. Grant testified that Lee's and Phillips' white powder was then combined in one bag, which he accepted from Phillips in exchange for the money.

Shortly thereafter, Grant left the apartment, and, while under constant surveillance by the police team, he returned to the museum parking lot, where he was again thoroughly searched. The substance which he purchased was promptly field tested and determined to be cocaine. A subsequent lab analysis verified the field test results and also precisely measured the amount of the cocaine to be 40.85 grams. However, Phillips and Lee were not immediately arrested thereafter, due to the ongoing nature of the investigation, and consequently no large amounts of cash, drugs, or drug paraphernalia were recovered from either of the defendants. The State's Attorney's office subsequently took possession of the taped record of the drug transaction.

At Phillips and Lee's consolidated trial, the State relied to a great degree on the taped conversations in order to prove the guilt of the two defendants. According to the prosecution, the tapes show "the entire drug transaction," and are the "crux of the case." Grant's testimony was also crucial, particularly with regard to identifying Lee as the third party involved in the transaction. Officers Sandberg and Chandler testified in great detail to the strict procedures that were followed in obtaining the cocaine, including thorough searches of Grant's person immediately before arriving at and after leaving Phillips' apartment, in order to establish a secure chain of evidence. The defense, on the other hand, presented only two witnesses: Cap-

tain Ronald Nash of the Chicago police department testified that Grant was untrustworthy, and that anything he says should be "taken with a grain of salt." Phillips' wife claimed that Grant and her husband were the only people in the apartment on the night of the alleged drug transaction and that she did not see any cocaine that evening.

On July 24, 1984, when the defense rested its case, Phillips' counsel suggested that the trial judge consider reviewing the tapes before final arguments and rendering a decision. There was no objection from the State or from Lee's attorney, and the judge agreed that it was a good idea to give the recordings another audition. Accordingly, the judge instructed the State to "make arrangements with your sound people that I can listen to the tape," and he indicated that he would do so on August 1. The judge said nothing about allowing the respective attorneys to attend the session when he would listen to the recorded evidence. Between the time of the defense's request and summation by counsel, which was had on August 16, 1984, the judge listened to the tapes for one hour in chambers in the presence of only the prosecutor. The record is unclear on which date precisely the judge reviewed the tapes.

■ Defense counsel assert that they learned only shortly before closing arguments of the circumstances under which the judge reviewed the tapes. However, the record discloses that no objection was raised either prior to or during summation concerning any alleged impropriety on the part of the judge and the assistant State's Attorney; instead, the defendants waited until the time to file post-trial motions to make their allegations that there had been improper communications between the judge and the prosecutor.

In a hearing before the same judge on the post-trial motions, the defendants offered the testimony of James Ruben (Ruben), an assistant public defender, who related that he went to the judge's chambers on a matter unrelated to this case and observed that the prosecutor was operating a "reel-to-reel" tape machine. No defense lawyers were present. Ruben stated that he was in chambers for only 5 to 10 minutes, but that during that time he heard the prosecutor explain the use of the machine and observed him demonstrating to the judge how it worked. Ruben further alleged that he saw the prosecutor play the tape and then heard him ask the judge if he had heard a particular part of the recording. The prosecutor then rewound a portion of the tape and replayed it. Ruben recalled commenting to the prosecutor that the tape machine looked complicated, and he also questioned whether it would not be easier to transfer the recordings to a cas-

sette. On cross-examination, Ruben conceded that the tape may have been stopped when he entered the judge's chambers so that the judge could speak with him and not necessarily because there was something significant on the tape that the prosecutor wished to emphasize. Ruben claimed that he disclosed the substance of this meeting to the defense attorneys immediately before closing arguments were to be heard.

In opposition to the post-trial motions, the prosecutor testified that the judge asked him to bring the tapes and the tape machine to his chambers. However, the prosecutor did not realize at the time that he would have to operate the machine for the judge, and therefore he did not inform either of the defense attorneys. The prosecutor admitted that evidence technicians from the State's Attorney's office had accompanied him to the judge's chambers and had actually carried the machine into chambers. However, the technicians could not remain to operate the device due to an unexplained scheduling conflict. The prosecutor did not know who the technicians were, why they were unavailable to the judge, where they went, or whether they left the building.

According to the prosecutor, the judge told him when the technicians left that he did not know how to operate the complex reel-to-reel tape machine that had to be used in order to listen to the recordings. The prosecutor testified that he then manually operated the machine for the judge, turning it on and off only at the judge's request or because of an interruption. The prosecutor resolutely maintained that he never made any comments as to the substance of the tapes, nor did the judge question him about the recordings.

The trial judge denied both defendants' motions for a new trial, stating:

> "[T]here was no undue influence. There was no improper playing of the tape. Counsel knew that the tapes were going to be played. In fact, the record will bear out or hopefully it will bear out. It certainly should because it was discussed that there was a date set, and I said that will be the date and I will listen to the tapes."

The record is unclear as to whether the judge tried to hear the tapes on August 1, as he indicated he would do, nor is it clear, as noted earlier, when the tapes were in fact audited. It is clear, however, that the defendants did not show any interest in attending the August 1 session at which the judge would listen to the taped evidence.

Both defendants assert that the manner in which the trial judge reviewed the evidence constitutes reversible error as a violation of ei-

ther: (1) their constitutional rights; (2) applicable canons of ethics; or (3) circuit court of Cook County rules. According to the defendants, the constitutional rights that were infringed include: (1) their right to be present throughout all "critical stages" of the trial; (2) their right to effective assistance of counsel; and (3) their right to a fair trial, free from undue influence.

This court has recognized that alleged prosecutorial misconduct can be harmless error in cases where there is overwhelming evidence of guilt. (*People v. Hudson* (1985), 137 Ill. App. 3d 606, 610-11, 484 N.E.2d 1246.) Indeed, the Supreme Court has stated that there are "some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, *** be deemed harmless, not requiring the automatic reversal of the conviction." (*Chapman v. California* (1967), 386 U.S. 18, 22, 17 L. Ed. 2d 705, 709, 87 S. Ct. 824, 827.) The standard for harmless error articulated by the court in *Chapman* is "whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828.

The alleged error in the case at bar had nothing whatever to do with the playing or the admissibility of the tapes at trial, but rather, obviously, it concerned the circumstances under which the judge reviewed those tapes prior to his rendering a decision, but after the defense rested. The judge-prosecution episode complained of by the appellants herein was, to be sure, thoughtless; nevertheless, the evidence of guilt adduced at trial in this cause amounted to incontestable proof thereof. A review of the record discloses that Grant went to Phillips' apartment without any cocaine, and left approximately an hour later with 40.85 grams. Grant's testimony that the two defendants were the sellers was credible and was corroborated by the fact that he went into the apartment with $3,300 and left with cocaine. Two police officers also testified persuasively that Grant could not have received the cocaine from an intervening source. Most important, the transaction of money in exchange for the drugs was clearly recorded on tapes, the admissibility of which, we repeat, is not questioned on appeal, and those tapes were considered by the trier of fact. It is also fair to say as to the defense witnesses that Phillips' wife was totally unconvincing, and Officer Nash gave only a personal opinion regarding Grant's character which utterly failed to rebut the State's evidence. In sum, this is not a case which warrants reversal.

Accordingly, although we neither approve of nor condone the action of both the judge and the prosecutor, we deem it unnecessary at this time to parse the merits of each of the arguments set forth by

the defendants for the reason that any error that may have occurred herein was clearly and unmistakably harmless in light of the overwhelming evidence of the guilt of both defendants. Furthermore, there is no indication that any evidence was considered in chambers which was not produced at trial. The record reveals that the judge's review of the recorded evidence in his chambers, far from being secret, as witness Ruben's unobstructed access to the judge's chambers in the midst of his audition of the tapes indicates, was suggested by the defense and agreed to by the parties; in fact, the tapes were relied upon by Phillips and Lee as a means of convincing the judge of the efficacy of their various defense theories. We find no evidence in the record which persuades us to accept defendants' argument on appeal that the trial judge in essence conducted a private inquiry outside of the defendants' presence. Instead, the testimony of the witnesses pursuant to defendants' post-trial motion reveals that the prosecutor was merely assisting the judge to operate a complex tape machine. In addition, defense counsel knew that the tapes were in the possession of the State; they evidently did not seek to attend the scheduled August 1 audition; nor does their waiting until they presented their post-trial motion to signal their discontent, although they knew before the judge's decision and sentencing of the tape incident, add any luster to their arguments. Under these circumstances, it cannot be said that defendants were prejudiced by the method in which the judge happened to review the tapes.

■ We now address the additional issues which Lee alone presents to this court. He first contends that he was not proved guilty beyond a reasonable doubt because, his argument runs, the tapes do not corroborate his involvement in the drug transaction and, therefore, the only evidence linking him to the transaction was Grant's unreliable testimony identifying him as the third party. In support of this argument, Lee emphasizes that he was never specifically identified in the tape recordings. Indeed, Phillips and Grant were recorded as talking to a man named "Norman," and no last name was ever identified. Moreover, it is also true that Grant has a history of drug abuse and disciplinary problems. The law is clear, however, that the defects that can be ascribed to the testimony as to Grant's credibility "go to *** the weight of the evidence and the credibility of the witnesses, matters peculiarly within the province of the court or jury in the first instance, and if the jury or trial court is satisfied by the testimony *** that the defendant is guilty beyond a reasonable doubt, we will not disturb a conviction on review unless it is plainly apparent that such degree of proof is lacking." (*People v. Hansen* (1963), 28 Ill.

2d 322, 332-33, 192 N.E.2d 359.) In light of the evidence adduced in this case, we cannot accept Lee's argument that it is entirely fortuitous that a "Norman" is among the exceedingly circumscribed cast of characters, albeit lacking a surname on the tapes, and that therefore it is "plainly apparent" that Lee had no part in the offense for which he was tried and convicted.

■ Lee next contends that the State did not prove that he delivered in excess of 30 grams of cocaine. According to Lee, Phillips made an initial delivery of approximately 28 grams of cocaine to Grant for which he should not be held accountable. Lee then left and later returned with approximately 12 more grams of cocaine. As part of a separate transaction, Lee then delivered the other 12 grams. Hence, Lee's argument runs, it was improper to aggregate whatever extra amount he may have brought in order to convict him for a Class X felony.

The trial court, however, found that

"both defendants were acting together in the delivery of this substance and the delivery of this substance was more than thirty grams, and not less. It was one delivery where there was a twenty minute, half hour wait in between. Together clearly it was one delivery. Both people were accountable, actively took part."

Under Illinois law, "[a] person is legally accountable for the conduct of another when: *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) The record indicates that it was Lee who left the apartment to get more cocaine, after which the drug was combined in one bag and given to Grant in exchange for cash. As in the case of *People v. Zambetta* (1985), 132 Ill. App. 3d 740, 477 N.E.2d 821, "[t]he evidence disclosed at trial irrefutably places the defendant at the scene of the drug transaction, and the defendant's behavior reveals that he 'shared the common illegal purpose' and made affirmative acts to promote the sale of cocaine." (132 Ill. App. 3d 740, 750, 477 N.E.2d 821.) Hence, the conclusion of the trier of fact that the transaction *sub judice* was one and inseparable is reasonable and consequently will not be disturbed on appeal.

■ Finally, Lee contends that the trial court erred by allegedly relying upon hearsay evidence, as to which Lee's objections were overruled. According to Lee, Grant's testimony that Phillips told him that Lee was one of his suppliers constituted the inadmissible hearsay.

However, assuming this testimony to be hearsay, we believe its admission was clearly harmless. This court has stated that the allowance of inadmissible evidence can or will be held to be harmless error if "the alleged erroneously admitted evidence did not prove an element of the crime not established by other properly admitted evidence." (*People v. Bundy* (1979), 79 Ill. App. 3d 127, 134, 398 N.E.2d 345.) In the case at bar, ample competent evidence proved Lee guilty beyond a reasonable doubt of the offense for which he was charged. Hence, we find no reversible error in permitting this testimony.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

STAMOS and HARTMAN, JJ., concur.